UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                      )
ARIZONA MINING ASSOCIATION, et al,    )
                                      )
            Plaintiffs,               )
                                      )
    v.                                )    Civil Action No. 07-1054 (RBW)
                                      )
LISA P. JACKSON, ADMINISTRATOR,       )
UNITED STATES ENVIRONMENTAL           )
PROTECTION AGENCY, et al,             )
                                      )
            Defendants.               )
_____)

## MEMORANDUM OPINION

The plaintiffs, Arizona Mining Association, New Mexico Mining Association, and Phelps Dodge Bagdad, Inc., bring this action against the defendants, the United States Environmental Protection Agency ("EPA"), and its Administrator, Lisa P. Jackson[1], seeking review of final action by the defendants under the Administrative Procedure Act, 5 U.S.C. § 702 (2006) ("APA"). First Amended Complaint ("Am. Compl.") ¶ 1. The plaintiffs seek an order "holding unlawful, vacating, and setting aside" certain actions taken by the defendants under the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. § 11023 (2006) ("Right-To-Know Act" or "the Act"). Am. Compl. ¶ 1. This matter is currently before the Court on the plaintiffs' motion to compel the EPA to produce and file with the Court the administrative record in this case. See Plaintiffs' Motion to Compel Production of the Administrative Record. The EPA opposes the plaintiffs' motion, and cross-moves to dismiss the plaintiffs' first amended

---

[1] The plaintiffs substituted Jackson for Stephen L. Johnson, the former Administrator of EPA, in their First Amended Complaint. Am. Compl. ¶ 1.

1

complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] See Opposition to Plaintiffs' Motion to Compel Production of the Administrative Record and Cross-Motion to Dismiss First Amended Complaint ("Defs.' Opp'n").  For the following reasons, the Court must deny the plaintiffs' motion and grant the EPA's cross-motion.

## I. BACKGROUND

"Plaintiff Arizona Mining Association . . . is a non-profit business league, whose members include companies engaged in exploration and mining activities in Arizona."  Am. Compl. ¶ 4.  "Plaintiff New Mexico Mining Association . . . is a trade association whose members include companies that explore, produce, and refine metals, coal and industrial materials."  Id. ¶ 6.  "Plaintiff Phelps Dodge Bagdad, Inc. . . . is engaged in the business of copper mining."[3]  Id. ¶ 8.  According to the plaintiffs, their member companies are required to comply with the "Toxic Release Inventory" ("TR Inventory") reporting requirements set forth in the Right-To-Know Act.  Id. ¶¶ 5, 7, 8.  The Act requires certain industrial facilities to complete a toxic chemical release form for certain toxic chemicals that are "manufactured, processed, or otherwise used" in quantities exceeding designated thresholds.  28 U.S.C. § 11023(a).  The Act defines "manufacture" as "to produce, prepare, import, or compound a toxic chemical."  28 U.S.C. § 11023(b)(1)(C)(i).  It defines "process" as "the preparation of a toxic chemical, after its manufacture, for distribution in commerce . . ."  28 U.S.C. § 11023(b)(1)(C)(ii).

---

[2] The Court also considered the following documents in resolving these motions: Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Compel Production of the Administrative Record (Pls.' Mem. I); Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Cross-Motion to Dismiss First Amendment Complaint ("Pls.' Mem. II"); and Reply in Support of Defendants' Motion to Dismiss First Amended Complaint ("Defs.' Rep.").

[3] The plaintiffs contend that Plaintiff Phelps Dodge Bagdad, Inc. has undergone a name change since this action was filed, and is now known as "Freeport-McMoRan Bagdad, Inc."  Pls.' Mem. II at 3 n. 2.

The EPA promulgated a final rule in 1988 to implement the TR Inventory reporting requirements. 40 C.F.R. § 372 (2009) ("the 1988 Rule"). It adopted as part of the rule the statutory definition of "manufacture" in its entirety, and added that the term

> [m]anufacture also applies to a toxic chemical that is produced coincidentally during the manufacture, processing, use, or disposal of another chemical or mixture of chemicals, including a toxic chemical that is separated from that other chemical or mixture of chemicals as a byproduct, and a toxic chemical that remains in that other chemical or mixture of chemicals as an impurity.

40 C.F.R. § 372.3.

In the preamble to the 1988 Rule, the EPA explained that "[this] proposed rule's approach was intended to cover those situations in which a listed toxic chemical is created (intentionally or unintentionally) and then passed on in commerce or disposed of, but never otherwise accounted for." Toxic Chemical Release Reporting; Community Right-to-Know, 53 Fed. Reg. 4500, 4504 (Feb. 16, 1988) (codified at 40 C.F.R. pt. 372). The plaintiffs allege that this explanation limits the EPA's definition of "manufacture" to the "'creation' of chemicals." Am. Compl. ¶ 13.

The 1988 Rule also contained a de minimis exemption which permitted covered facilities to disregard certain de minimis quantities of toxic chemicals "when determining whether an applicable threshold has been met under § 372.25 or determining the amount of release to be reported under § 372.30." 40 C.F.R. § 372.38(a) (2009). The de minimis exemption applies if "a toxic chemical is present in a mixture of chemicals at a covered facility and the toxic chemical is in a concentration in the mixture which is below 1 percent of the mixture, or 0.1 percent of the mixture in the case of a toxic chemical which is a carcinogen . . . ." Id. The rule defines "mixture" as

3

> any combination of two or more chemicals, if the combination is
> not, in whole or in part, the result of a chemical reaction.
> However, if the combination was produced by a chemical reaction
> but could have been produced without a chemical reaction, it is
> also treated as a mixture. A mixture also includes any combination
> which consists of a chemical and associated impurities.

Id. at § 372.3.

The plaintiffs allege that metal mining facilities were not subject to the TR Inventory reporting requirements under the 1988 Rule. Am. Compl. ¶ 15. However, in 1997, the EPA promulgated a second final rule subjecting metal mining facilities to the TR Inventory reporting requirements. 62 Fed. Reg. 23834, 23857 (May 1, 1997) (codified at 40 C.F.R. pt. 372) ("the 1997 Rule"). The preamble to the 1997 Rule set forth the following interpretation of the term "manufacture":

> 'Manufacture' of a specific listed toxic chemical includes its
> production. [The] EPA interprets 'production' to include creation.
> Production of that listed chemical may occur naturally, or by
> industrial process. Metals contained in ores are produced by
> natural processes. Consequently, [Right-To-Know Act] section
> 313 chemicals which exist in nature have been 'manufactured' at
> some point, as defined under [Right-To-Know Act] section 313.

Id.

The EPA then concluded that extraction and beneficiation of naturally occurring toxic chemicals amounts to "processing" of those chemicals under section 313 of the Act:

> The preparation of toxic chemicals contained in the ore for
> distribution in commerce occurs after it has been 'manufactured'
> (i.e., produced). The preparation of that [Right-To-Know Act]
> section 313 toxic chemical involves its separation from its natural
> state. Therefore, the extraction for distribution in commerce of the
> toxic chemical is 'processing' under [Right-To-Know Act] section
> 313. Other activities, such as beneficiation, are also processing
> under [Right-To-Know Act] section 313 because the listed toxic
> chemical is being further prepared for distribution in commerce.

Id.

4

The mining industry challenged the EPA's definition of "manufacture" in this and a second federal district court. See Barrick Goldstrike Mines, Inc. v. Whitman, 260 F. Supp. 2d 28 (D.D.C. 2003); Nat'l Mining Ass'n v. Browner, No. Civ. A. 97 N 2665, 2001 WL 1886840 (D. Colo. Jan. 16, 2001). In National Mining, the National Mining Association, on behalf of its members,[4] challenged the EPA's interpretation of the terms "manufacture" and "process" as applied to ore extraction and beneficiation. National Mining, 2001 WL 1886840, at *6. The court determined that "[b]ecause naturally occurring undisturbed ores are not 'manufactured' within the meaning of The Right-to-Know Act the extraction and beneficiation thereof cannot constitute processing." Id. at *7. The court's accompanying order, however, set aside the EPA's interpretation of both "manufacture" and "process":

> Plaintiffs' request is granted to the extent that plaintiffs seek an order from this court setting aside [the] EPA's definition and interpretation of the terms "process" and "manufacture" as including extraction and beneficiation. The EPA's definition and interpretation are hereby set aside and defendants are enjoined from enforcing those definitions.

Id. at *10.

The EPA sought clarification of the court's order, arguing that the court improperly set aside the EPA's definition of the term "manufacture" as including extraction and beneficiation because the issue was not presented to the court and the holding was inconsistent with the rest of the opinion. Id. at *12. The court agreed and modified its order to read: "Defendants' definition and interpretation of the term 'process' as including the extraction and beneficiation of naturally occurring, undisturbed ores is hereby set aside and defendants are enjoined from enforcing that

---

[4] The EPA asserts that Arizona Mining Association and New Mexico Mining Association, both plaintiffs in this case, are members of the National Mining Association. Defs.' Opp'n at 4.

5

definition." Id. However, the court did not address the issue of "whether the term 'manufacture' includes extraction and beneficiation activities." Id.

Following the court's order of clarification, the National Mining Association's counsel sent two letters to the EPA setting forth its understanding of the TR Inventory reporting obligations of mining facilities in light of the court's decision in National Mining. See Defs.' Opp'n, Ex. D at 6-7. The EPA responded to the National Mining Association's requests in letters dated June 14, 2001 ("the June 14 letter") and June 28, 2001 ("the June 28 letter"). Pls.' Mem. I, Ex. 6; id., Ex. 7. In the June 14 letter, the EPA sought to clarify the court's order in National Mining, stating that

> [t]he Court's order only addresses [the] EPA's interpretation that undisturbed ores had been 'manufactured' by natural forces, and that, therefore, the extraction and beneficiation of those ores constituted the 'processing' of the toxic chemicals contained in that ore. It is this interpretation alone that the Court set aside, and of which [the EPA] chose not to seek reconsideration.

Pls.' Mem. I, Ex. 6 at 2. The EPA went on to explain that "[i]n its original opinion, the Court explicitly declined to reach the question of whether manufacturing that occurs during the course of extraction and beneficiation activities is a threshold activity. This is distinct from whether the extraction and beneficiation activities themselves constitute a particular threshold activity . . . ." Id. The June 14 letter asserts that, in light of the court's order of clarification in National Mining, "facilities must continue to consider toward their manufacturing thresholds any toxic chemicals generated during extraction and beneficiation that were not present in the naturally occurring, undisturbed ores." Id. Finally, the EPA noted that

> [i]n the near future [the EPA] intends to initiate rulemaking to adopt a revised interpretation that will allocate extraction and beneficiation activities between these two statutory terms. However, until this rulemaking is completed, [the] EPA will not definitively resolve whether a particular activity is best

6

> characterized as 'manufacturing' or as 'processing.' For now,
> individual facilities will remain responsible for determining
> whether their preparation of the toxic chemicals in the ore is better
> characterized as 'manufacturing' or 'processing.'

Id. at 3.

The second letter National Mining Association's counsel sent to the EPA requested clarification of statements the EPA made in the June 14 letter. See Pls.' Mem. I, Ex. 7 at 1. The June 28 letter "sets out [the] EPA's understanding of the Court's Orders and Opinions [in National Mining], and their impact on TR [Inventory] reporting." Id. The EPA also noted that the court did not attempt to define the full scope of a mining facility's TR Inventory reporting obligations. Id at 2. Rather, the EPA stated that "the Court only addressed the claims the [National Mining Association] raised, which is distinct from the question of whether a facility must count towards thresholds, any toxic chemicals created during these activities." Id.

The National Mining Association filed a motion in the Colorado district court to modify the court's previous injunction in National Mining. See Defs.' Opp'n, Ex. D[5] at 1 (National Mining Association v. Browner Order and Memorandum of Decision). The National Mining Association alleged that the EPA explained in the 1997 rule that extraction and beneficiation activities constituted "processing" and not "manufacturing," id., Ex. D at 14, but the court rejected the National Mining Association's position, holding that EPA was not required to engage in formal rulemaking procedures before issuing the June 14 and June 28 letters because the letters were "not legislative rules," id., Ex. D at 18.

The plaintiffs allege that the EPA adopted a new definition of "manufacture" in the June 14 and June 28 letters. Am. Compl. ¶ 19. The plaintiffs further allege that these letters

---

[5] Because the defendant did not label its exhibits, the Court has labeled them alphabetically in the order in which they were presented to the Court.

7

constitute final agency action under the APA, id. ¶ 20, and that these interpretations are "contrary to law." Id. ¶ 28; see also id. ¶ 39.

On March 10, 2004, plaintiff Phelps Dodge Bagdad sent an email to the EPA in response to the EPA's inquiry into Phelps Dodge Bagdad's compliance with the TR Inventory reporting requirements. Pls.' Mem. I, Ex. 9 ("Phelps Dodge Bagdad Letter") at 1. In its email, Phelps Dodge Bagdad articulated its view that its copper flotation tailings constitute a mixture which are therefore exempt from TR Inventory reporting requirements under the de minimis exemption. Id. Copper flotation tailings, according to the plaintiffs, are "the materials remaining after as much copper as technologically and economically feasible has been removed by the flotation process. Copper flotation tailings are a combination of naturally occurring chemicals that are not the result of any chemical reaction." Am. Compl. ¶ 30. The EPA responded to Phelps Dodge Bagdad's position in a letter dated August 4, 2004. Pls.' Mem. I, Ex. 9. The EPA explained its position as follows:

> Because the tailings at [Phelps Dodge Bagdad] are separated from a mixture, toxic chemicals in the tailings are ineligible for the *de minimis* exemption. A mixture is defined to include any combination which consists of a chemical and associated impurities. [The] EPA's regulations draw a distinction between a toxic chemical impurity that remains in that other chemical or mixture of chemicals and a byproduct that is separated from that other chemical or mixture of chemicals. Therefore, "mixture" cannot be read to include "byproducts" or other toxic chemicals that are separated from a mixture. . . . As toxic chemicals that are separated from the original mixture, the toxic chemicals in [Phelps Dodge Bagdad]'s tailings are no longer "present in a mixture" and therefore are byproducts which are not eligible for the *de minimis* exemption.

Id. at 2 (citations omitted).

The plaintiffs now allege that the EPA's position in the Phelps Dodge Bagdad letter is inconsistent with the 1988 Rule. Am. Compl. ¶ 33, 35. The plaintiffs further allege that the

8

letter constitutes reviewable final agency action under the APA, id. ¶ 32, and that the EPA's position in the Phelps Dodge Bagdad letter was adopted without prior notice and opportunity to comment. Id. ¶¶ 33, 35.

## II. LEGAL ANALYSIS

The EPA argues that the Court should dismiss all of the plaintiffs' claims because the three challenged letters are not reviewable final agency actions within the meaning of the APA. Defs.' Opp'n at 15. In response, the plaintiffs argue that "[the EPA] can make these claims with a straight face only by completely ignoring and declining to address critical record material. . . . [which makes] clear that the [EPA] interpretations that plaintiffs challenge are at significant variance either with the 1988 and 1997 TR Inventory rules or with prior, definitive [EPA] interpretations of those rules." Pls.' Mem. II at 3. Moreover, the plaintiffs argue that the "EPA communicated the challenged interpretations in a manner that leaves no doubt that they are [the] EPA's final word on the subject, short of an enforcement action." Id. For the following reasons, the Court finds that the EPA has the stronger position.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the plaintiff has properly stated a claim upon which relief may be granted. Woodruff v. DiMario, 197 F.R.D. 191, 193 (D.D.C. 2000). In the context of the APA, judicial review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (2006). Two conditions must be satisfied for an agency action to be considered "final": "First, the action must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights and obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997)

(citations omitted). In other words, "[t]he agency must have made up its mind, and its decision must have inflicted an actual, concrete injury upon the party seeking judicial review." AT&T v. EEOC, 270 F.3d 973, 975 (D.C. Cir. 2001) (citations omitted). Moreover, in this Circuit, an agency's restatement of an established interpretation is not reviewable final agency action. See Indep. Equip. Dealers Ass'n v. EPA, 372 F.3d 420, 428 (D.C. Cir. 2004) (holding that an EPA letter was not reviewable final agency action because the letter "tread no new ground" and "left the world just as it found it"); see also Gen. Motors Corp. v. EPA, 363 F.3d 442, 449 (D.C. Cir. 2004) (holding that EPA letters were not reviewable final agency actions because the letters "reflect neither a new interpretation nor a new policy"). Thus, the EPA's letters that are the subject of this litigation are reviewable final agency actions only if the EPA adopted in the letters a new interpretation of any of the terms challenged by the plaintiffs. If the EPA's letters are reviewable final agency actions, the Court must, to the extent a different position has been articulated,

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be
>
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
>>
>> (D) without observance of procedure required by law.

5 U.S.C. § 706(2)(C)-(D).

In <u>Independent Equipment Dealers Ass'n</u>, a case relied upon by the EPA, the Court held that an EPA letter which "tread no new ground" did not constitute an agency "rule" reviewable under the APA because it "[could not] be fairly described as implementing, interpreting, or

prescribing law or policy."[6] 372 F.3d at 428. In that case, the Independent Equipment Dealers Association ("IEDA") wrote to the EPA seeking the EPA's view on a regulation pertaining to an emission control information labeling program for "nonroad engines". Id. at 424. In the letter, the IEDA stated its own view of the regulation, id., just as the National Mining Association did here. The EPA responded that it did not concur with the IEDA's interpretation of the regulation, and reiterated its own longstanding interpretation of the regulation. Id. The Court reached its conclusion based on findings that

> the EPA Letter merely restated in an abstract setting – for the umpteenth time – [the] EPA's longstanding interpretation of the Part 89 certificate of conformity regulations. The Letter neither announced a new interpretation of the regulations nor effected a change in the regulations themselves. The Letter was purely informational in nature; it imposed no obligations and denied no relief. Compelling no one to do anything, the letter had no binding effect whatsoever – not on the agency and not on the regulated community.

Id. at 427.

The District of Columbia Circuit reached a similar result in General Motors Corp. v. EPA, where the Court held that the EPA letters did not constitute reviewable final agency action because it did not "impose[] new requirements on regulated parties or exclusively guide[ the] EPA's subsequent enforcement activities." 363 F.3d at 451. General Motors had challenged the EPA's interpretation that automobile manufacturing paint purge solvents were "solid waste" upon leaving the spray painting unit under the Resource Conservation and Recovery Act ("RCRA"). Id. at 445. The Court explained that the letters

---

[6] Although the Independent Equipment Dealers Ass'n only challenged the EPA letter under the Clean Air Act, the Court explained that the term "final agency action" in the Clean Air Act is synonymous with the term "final agency action" as used in the APA. Indep. Equip. Dealers Ass'n, 372 F.3d at 428.

11

> neither mark the consummation of [the] EPA's decisionmaking
> process nor impose new substantive rights or obligations on field
> personnel, the States, or third parties. Rather, the letters were part
> of the ongoing dialogue initiated by the industry about [the] EPA's
> nascent enforcement actions at certain automobile manufacturing
> plants that were based on the regulatory interpretation in the
> RCRA Policy Compendium.

Id. at 450 (citations omitted).

A.      The Plaintiffs' Challenges to the EPA's Interpretation of the Term "Manufacture"

The plaintiffs allege that the EPA adopted a new interpretation of the term "manufacture" in the June 14 and June 28 letters. Am. Compl. ¶ 19; see also Pls.' Mem. I, Exs. 6, 7. They allege that the 1988 and 1997 rules promulgated by the EPA limited the definition of "manufacture" to the "creation" of toxic chemicals, while the June 14 and June 28 letters do not so limit the term. Am. Compl. ¶¶ 13, 15, 16, 19. The plaintiffs further allege that the EPA's "new interpretation is not tentative." Pls.' Mem. II at 5. Finally, the plaintiffs allege that the EPA adopted its new interpretation of the term "manufacture" without prior notice and opportunity to comment, Am. Compl. ¶¶ 19, 22, and that the new interpretation is contrary to law. Id. ¶ 28. The EPA, however, maintains that its statements in the letters are consistent with the interpretation of the term "manufacture" set forth in the 1988 and 1997 Rules, and accordingly are not judicially reviewable final agency actions. Defs.' Opp'n at 17. In the alternative, the EPA argues that the letters challenged by the plaintiffs are mere policy statements or interpretive rules, which are not subject to the rulemaking requirements of the APA. Id. at 23-24.

When considering a motion to dismiss, "[t]he nonmoving party is entitled to all reasonable inferences that can be drawn in her favor." Artis v. Greenspan, 158 F.3d 1301, 1306 (D.C. Cir. 1998). Here, even drawing those inferences in the plaintiffs' favor, the EPA's

statements in the June 14 and June 28 letters do not constitute reviewable final agency action because they merely restate the EPA's existing interpretation of the 1988 and 1997 Rules. The preamble to the 1988 Rule that the plaintiffs rely upon explains that the EPA's interpretation of the term "manufacture" "was intended to cover those situations in which a listed toxic chemical is created (intentionally or unintentionally) and then passed on in commerce or disposed of, but never otherwise accounted for." Toxic Chemical Release Reporting; Community Right-to-know, 53 Fed. Reg. at 4504 (Feb. 16, 1988). In a portion of the same preamble not quoted by the plaintiffs, the EPA expounds upon its interpretation of the term: "[The] EPA proposed to interpret 'manufacture' to include coincidental production of a listed toxic chemical as a byproduct or impurity during the manufacture, processing, use, or disposal of any other chemical substance or mixture." Id. This interpretation of the term "manufacture" was codified at 40 C.F.R. § 372.3. Accepting all of the plaintiffs' allegations as true, the 1988 Rule and its preamble are entirely consistent with the EPA's statements in the June 14 and June 28 letters. In the June 14 letter, the EPA makes clear that its conclusion that extraction and beneficiation activities can include manufacturing activities specifically pertains to the coincidental manufacture of a listed toxic chemical <u>during the course</u> of such activities. As the EPA explains, "[t]his is distinct from whether the extraction and beneficiation activities <u>themselves</u> constitute a particular threshold activity . . . ." Pls.' Mem. I, Ex. 6 at 2 (emphasis added). The EPA reiterated its position in the June 28 letter. <u>Id.</u>, Ex. 7 at 2. Contrary to the plaintiffs' claims, one cannot reasonably infer that the EPA's statements purport to equate extraction and beneficiation activities with the definition of "manufacture." Rather, the statements confirm the EPA's longstanding interpretation that the coincidental manufacture of a toxic chemical during the course of extraction and beneficiation amounts to a threshold activity that triggers the TR

Inventory reporting requirements, separate and distinct from the extraction and beneficiation activities themselves, which also trigger the TR Inventory reporting requirements.

The plaintiffs place great emphasis on the EPA's statement in the June 14 letter that "[f]or now, individual facilities will remain responsible for determining whether their preparation of the toxic chemicals in the ore is better characterized as 'manufacturing' or 'processing.'" Id., Ex. 6 at 3. They argue that this statement requires facilities to classify their extraction and beneficiation activities as <u>either</u> manufacturing <u>or</u> processing, which would be inconsistent with the EPA's prior interpretation of the terms. Pls.' Mem. II at 5. While at first blush the EPA's statement may be read to endorse an interpretation of the term "manufacture" that includes extraction and beneficiation, when read in the context of the entire letter, it is clear that the EPA intended that facilities only classify as "manufacture" the coincidental manufacture of toxic chemicals that may take place in the course of extraction and beneficiation, not the extraction and beneficiation activities themselves. See Pls.' Mem. I, Ex. 6 at 3 (explaining that "[i]f a specific toxic chemical is generated through beneficiation activities, then that newly generated toxic chemical must be considered toward the facility's manufacturing threshold for that chemical.").

Finally, the plaintiffs rely upon a variety of other instances where they allege that the EPA took a position inconsistent with the position it now takes in the June 14 and June 28 letters. Pls.' Mem. II at 4. In each document, the EPA takes the position that extraction and beneficiation activities constitute "processing", and not "manufacture". Id. Because the June 14 and June 28 letters do not alter this position, the plaintiffs' reliance on those other documents is misplaced. Thus, contrary to the plaintiffs' position, the EPA's statements in the June 14 and June 28 letters "left the world just as [they] found it". Indep. Equip. Dealers Ass'n, 372 F.3d at

14

428. Accordingly, the Court concludes that they are not final agency actions under the APA and Claims I, II, and V seeking judicial review must be dismissed. See id.

B.     **The Plaintiffs' Challenges to the EPA's Interpretation that Copper Flotation Tailings Are Not Eligible for the *De Minimis* Exemption**

The plaintiffs allege that the EPA's position in the Phelps Dodge Bagdad letter that copper flotation tailings are not eligible for the de minimis exemption is inconsistent with the 1988 Rule. Am. Compl. ¶ 33, 35; see Pls.' Mem. I, Ex. 9. They allege that copper flotation tailings constitute a mixture, the contents of which are eligible for the de minimis exemption. Am. Compl. ¶¶ 30, 31. The plaintiffs also allege that the Phelps Dodge Bagdad letter constituted final agency action. Id. ¶ 32. Alternatively, they allege that the EPA's adoption of the same interpretation in a publication on its Web site constitutes final agency action. Id. Finally, the plaintiffs allege that the "EPA's interpretation is [] a nonobvious and unanticipated reading of the regulation that was adopted without prior notice to the public and opportunity to comment." Id. ¶ 33. In response, the EPA maintains that the Phelps Dodge Bagdad letter is not judicially reviewable final agency action because it "merely reiterates past agency statements in response to specific inquiries from . . . [Phelps Dodge Bagdad]." Defs.' Opp'n at 19.

Although the Court recognizes that the Phelps Dodge Bagdad letter gives no indication that the EPA's position contained therein is tentative or interlocutory, the Court concludes that the EPA's position that copper flotation tailings do not qualify for the de minimis exemption is not reviewable final agency action because the EPA's position in that letter fails to satisfy the second criterion set forth by the Supreme Court in Bennett. See 520 U.S. at 177-78 Construing the facts in the light most favorable to the plaintiffs, the plaintiffs have not demonstrated that

15

they have suffered or will suffer any legal consequences as a result of the EPA's position in the Phelps Dodge Bagdad letter. The Phelps Dodge Bagdad letter is similar in character to the letter at issue in Independent Equipment Dealers Ass'n, that the Circuit found to be "purely informational in nature." 372 F.3d at 427. Here, Phelps Dodge Bagdad inquired into its obligations under the TR Inventory reporting requirements, just as was the case in Independent Equipment Dealers Ass'n. See id. at 421. And, the EPA merely provided a response to Phelps Dodge Bagdad's letter. In general, parties suffer no injury so as to render an agency's response final for purposes of the APA "when an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party." See AT&T, 270 F.3d at 975; see also DRG Funding Corp. v. HUD, 76 F.3d 1212, 1214 (D.C. Cir. 1996) ("[C]ourts have defined a nonfinal agency order as one, for instance, that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" (citation omitted)).

The plaintiffs attempt to characterize the Phelps Dodge Bagdad letter as an enforcement letter, Pls.' Mem. II at 16, but it is not. Although it asks Phelps Dodge Bagdad to "submit any necessary reports or revisions within 30 business days from [its] receipt of this letter," the letter stops short of an enforcement action. Pls.' Mem. I, Ex. 9 at 5. The plaintiffs make much of the fact that the EPA sent a carbon copy of the Phelps Dodge Bagdad letter to the Enforcement Division. Pls.' Mem. II at 16. But the letter neither actually threatened enforcement action, nor directed the Enforcement Division to initiate an enforcement action at the end of 3-day period. And if the EPA ultimately decided to initiate an enforcement action, Phelps Dodge Bagdad would certainly have the opportunity to present its arguments to the agency. Cf. CropLife America v. EPA, 329 F.3d 876, 882 (D.C. Cir. 2003) (holding that an agency action is

reviewable when the plaintiffs "[would] be afforded no additional opportunity to make the arguments to the agency that they [] present[ed] in th[eir] petition [for judicial review]"). Thus, the Phelps Dodge Bagdad letter does not have the qualities of reviewable final agency action. At most, in responding to what the EPA viewed as Phelps Dodge Bagdad's flawed interpretation of its obligations under the TR Inventory reporting requirements, the Phelps Dodge Bagdad letter amounted to a notice of violation, which also does not constitute final agency action. Royster-Clark Agribusiness, Inc. v. Johnson, 391 F. Supp. 2d 21, 27 (D.D.C. 2005). Accordingly, the Court must conclude that the Phelps Dodge Bagdad letter is not reviewable final agency action under the APA and claims III, IV, and V asserting otherwise must be dismissed.

### III. CONCLUSION

For the foregoing reasons, the EPA's motion to dismiss must be granted.[7] Accordingly, the plaintiffs' motion to compel must be denied.[8]

_____/s/_____
REGGIE B. WALTON
United States District Judge

---

[7] The plaintiffs also appear to raise a challenge to an EPA interpretation that naturally occurring chemicals that have not been manufactured, processed, or otherwise used are subject to TR Inventory reporting requirements. See Am. Compl. ¶¶ 24-28. Because the plaintiffs neither developed the position in their first amended complaint nor raised it in their memorandum in opposition to the defendants' motion to dismiss, the Court need not consider it.

[8] A Order consistent with this Memorandum Opinion was issued on March 31, 2010.

17